The relator, Harry R. Cabral, brings this mandamus suit for the purpose of compelling the Strudwick Funeral Home, Inc., a corporation, and its president, Fate Strudwick, to transfer to Cabral eight shares of the capital stock of the corporation standing on its books in the name of William Wallace, and represented by Certificate No. 5, dated September 5, 1934. Cabral alleges that the name of the corporation when the stock was issued was Pace-Strudwick Funeral Home, Inc.; that the said name was later changed to Strudwick Funeral Home, Inc.; that the stock in reality belongs to him, but that the certificate representing it was issued in the name of Wallace for convenience; that the said Wallace duly endorsed the certificate and that it has always remained in Cabral's possession, and that the corporation and its president refused to make the transfer when requested to do so.
The respondent corporation and Strudwick answered admitting that a certificate of stock for five shares was outstanding in the name of William Wallace, but denying all of the other allegations of the petition, and especially denying "that the certificate was endorsed by William Wallace." Both defendants admitted refusal to transfer the stock to Cabral.
The corporation, in addition to denying the genuineness of the endorsement of Wallace on the stock certificate, set up two other alternative defenses — one of estoppel, and in the other asserting that because of a by-law provision of the corporation, no stock certificate might be transferred until it had "first been offered to the corporation."
When the matter was on trial, Pauline Guss, widow of William Wallace, and Willie Joseph Wallace and William Wallace, Jr., appeared through an attorney and filed a written petition in which they alleged themselves to be the owners of the stock as the heirs of William Wallace and in which they prayed that the trial be delayed "for a period of no less than ten days to permit the interests of intervenors to be properly *West Page 761 
protected by the filing of proper intervention in these proceedings."
This delay was refused by the judge a quo by the following order "The judge refuses to permit the filing of this intervention at this late date for the purpose of delaying the trial of this cause."
There was judgment recognizing Cabral as the owner of the stock, ordering the corporation to transfer it to him, and ordering that any sale thereof by Cabral "be restricted according to Article 7 of the bylaws of this corporation * * *." Respondent corporation has appealed.
The record shows that there is not the slightest shadow of truth in the thinly veiled charge of the respondents that the endorsement on the stock certificate is a forgery. Cabral, as attorney, arranged the incorporation of the company and, when asked by the president what his fee would be, stated $200. The president, according to his own testimony, agreed that instead of paying this fee in cash, a certificate of stock would be issued for eight shares, but he suggested that "This company is a negro corporation and issuing a white man stock * * * will hurt the business."
Strudwick further said that Cabral had then said: "Well, I have a chauffeur called William Wallace. I will give it to him and anytime that the stock will be voted, William Wallace will vote with me."
For what conceivable reason would Cabral have actually donated eight shares of stock worth $200 to his negro chauffeur? What Cabral meant was that he would place the stock in the name of Wallace, but would himself retain ownership of it. Surely later on Wallace did not acquire it by purchase. It is shown that he was chauffeur, yard boy and butler for Cabral, and that he had no financial ability to buy stock. Mr. Cabral says that on the day after he received the certificate, Wallace endorsed it in his presence, and that he, Cabral, has had it ever since. Mr. Cabral's secretary, Miss Soledel Mulhall Hebert, testifies that she witnessed the endorsement of Wallace on the stock certificate, and is certain that it was written in her presence. As against this positive testimony of the genuineness of Wallace's endorsement, we find nothing which can be characterized as evidence that the signature was not genuine. No handwriting expert was introduced, though the record shows that counsel for respondents requested, and were granted, a delay in order that such an expert might be consulted and employed. Respondents rely exclusively on a comparison of certain other signatures of Wallace with the one which they challenge. They asked the trial court and they ask us to hold that from such comparisons it will appear that the endorsement is not genuine. We see no remarkable dissimilarity among the various signatures; certainly none sufficient to cast suspicion upon the signature which is involved, and as to the genuineness of which we find not only positive testimony but also many corroborating circumstances. The record shows that such dividends as were paid by the corporation, Cabral received and that he attended stockholders' meetings regularly. Respondents point to one dividend check which was made payable to Harry R. Cabral, attorney, and they contend that this evidences the fact that Cabral did not own the stock but held it as attorney for someone else. Cabral explains that the word "attorney" was placed after his name not to show that he represented someone else but merely as identifying him as an attorney.
It is quite evident that in this instance the placing of the word "attorney" after the name of the payee had no significance.
We have already dignified this unwarranted charge far beyond its just desserts and shall not by a more prolonged discussion, give ground for the belief that there appears anything whatever in it. The bylaw provision reads as follows: "No stock of this corporation may be sold by any stock holder at any time, without first offering for sale said stock to the stockholders of the corporation; this offer to be made in writing by the stockholder who desires to sell this stock to the secretary of the corporation, who shall notify each stockholder of the offer to sell. If no stockholder accepts to purchase the stock within the thirty day period from the date that the offer was made to sell same, the stockholder may place his stock for sale on the open market."
But that provision cannot be interpreted as preventing the placing in Cabral's name of stock, which not only already belongs to him but which was given to him by the corporation itself in payment of services rendered in connection with its own creation. It may prevent the sale by Cabral unless he first shall comply with its provisions, but it cannot prevent the transfer *West Page 762 
to the true owner of stock already issued under the circumstances set forth.
The judgment appealed from is affirmed, at the cost of appellant.
Judgment affirmed.